PAUL A. DEMONTESQUIOU, Esq., NC State Bar No. 42392
THE LAW OFFICES OF WALSH & DEMONTESQUIOU
8012 Stonehaven Drive
Marvin, NC 28173
Telephone (704) 989-2769

Attorney for Plaintiffs,
STEVEN BENEZRA AND MELISSA YORK

FILED
AUG 1 8 2011
IN THIS OFFICE
Clerk U. S. District Court
Greensboro, N. C.
By

UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | |
|---|---|
| STEVEN BENEZRA and MELISSA YORK, individually, | Case No. 1:11-cv-00596 |
| Plaintiffs, | **1ˢᵗ AMENDED COMPLAINT FOR DAMAGES AND REQUEST FOR JURY TRIAL:** |
| vs. | 1. Fraud |
| | 2. Rescission |
| ZACKS INVESTMENT RESEARCH, INC., ZACKS INVESTMENT MANAGEMENT, INC., LEONARD HARVEY ZACKS, BENJAMIN LAIB ZACKS, and MITCHEL ETHAN ZACKS inclusive, individually, | 3. Breach of Fiduciary Duty |
| | 4. Violation of the Securities and Exchange Act of 1934 |
| | 5. Violation of the North Carolina Securities Act |
| Defendants. | 6. Unfair and Deceptive Business Practices |
| | 7. Declaratory Relief |
| | 8. False Advertising |

_____

Plaintiffs, STEVEN BENEZRA and MELISSA YORK, for causes of action against Defendants,

and each of them, allege:

1

## **GENERAL PREAMBLE ALLEGATIONS**

1.     ZACKS INVESTMENT RESEARCH, INC., ZACKS INVESTMENT MANAGEMENT, INC., LEONARD HARVEY ZACKS, BENJAMIN LAIB ZACKS, and MITCHEL ETHAN ZACKS are hereinafter referred to collectively as "Zacks and/or Defendants." Defendants, and each of them, are organized and existing under the laws of the State of Illinois, and/or are authorized to do business in the State of Illinois, or are individuals residing in the State of Illinois, but each is doing business in the State of North Carolina, is authorized to do business in the State of North Carolina, and has not only minimal contacts with the State of North Carolina, but maximal contacts with the State of North Carolina.

2.     Steven Albert Benezra was born September 23, 1943 and moved to North Carolina's famed Research Triangle Park, whereupon he earned his Ph.D. from the University of North Carolina, Chapel Hill. Thereafter, Dr. Benezra enjoyed a very successful career as a chemist. He strove to benefit mankind by developing several therapeutic medications through his research work in the pharmaceutical industry.

3.     Dr. Benezra is a decades-long resident of North Carolina. He and wife Melissa York live in Hillsborough NC where, prior to 2008, and the circumstances surrounding this complaint, they had comfortably enjoyed the fruits of Dr. Benezra's 1994 retirement.

4.     Dr. Benezra intelligently managed his retirement nest egg himself for over 13 years, earning fair returns on stocks he bought and sold. Dr. Benezra had employed his research and analytical skills to buy stocks with good earnings growth potential.

5.     Dr. Benezra became concerned during late 2007 and early 2008 as financial markets began to move like a roller coaster in an unusual fashion. He carefully assessed the changing conditions. Dr. Benezra soon concluded that the only reasonable thing to do would be to seek an investment adviser to help him with the newly confusing factors affecting the stock market.

COMPLAINT FOR DAMAGES

6. Dr. Benezra conducted due diligence and interviewed many investment adviser candidates. He spent an incredible amount of time poring over data on financial websites, constantly seeking out the best possible guidance. Dr. Benezra made countless phone calls to the leading providers of investment advisory services. His statement was always the same: <u>"This market is acting strangely; I cannot figure this out anymore. I need help."</u>

7. In early 2008, Dr. Benezra began a careful examination of Zacks Investment Management ("ZIM"), a Registered Investment Adviser (RIA) subsidiary of Chicago-based Zacks Investment Research ("ZIR"), and other related Zacks entities. Dr. Benezra had been familiar with Zacks for years, given their prominent industry role in providing stock market research data to investment institutions and individuals.

8. After reviewing and discarding other less qualified adviser candidates, Dr. Benezra drilled deeply into the detailed stock market information that Defendants Zacks made available daily on their ZIR and ZIM websites.

9. Dr. Benezra was immediately drawn to the fact that ZIR founder and Chairman Leonard Zacks had received a Ph.D. in mathematics from the Massachusetts Institute of Technology. And he found comfort that Zacks was "the world's leading expert on earnings and using earnings estimates in the investment process" as well as "one of the largest providers of independent research in the United States". (See attached Exhibit #1)

10. Dr. Benezra found something very compelling about Zacks, upon which he relied. He found that Zacks <u>did not puff about what they did, but instead backed their statements with very hard statistics. This is the type of proof scientists rely upon.</u> (Emphasis added)

11. Zacks showed that over the past 20 years, even including the horrible years of 2000-2002 when the stock market suffered one of its greatest setbacks ever, Zacks' top-rated "#1 Rank" stocks performed at nearly 3 times the rate of return as the stock market as a whole. (Exhibit #2)

12. Dr. Benezra has a high degree of understanding of statistics and mathematical models. He wanted to make sure Zacks' representations about their superior stock-picking capabilities were correct. Thus, Dr. Benezra called and spoke with Zacks

associates in Chicago, requesting further explanation, detail and confirmation of the facts and statistics represented by Zacks.

13.     It was confirmed to Dr. Benezra that, in fact, Zacks #1 Rank stocks had achieved a spectacular cumulative return of 39.8% during the 2000-2002 "dot.com" bust while the broad market (as measured by the Standard and Poor's 500 Index) had actually *declined* 43.08% during those same three years!

14.     Still, Dr. Benezra sought additional validation of the statistics. Thereafter, Zacks advised Dr. Benezra that it did extensive business in the State of North Carolina, had offices in the State of North Carolina and even had Regional Vice Presidents ("RVP's") residing in the State of North Carolina who would meet with him. (Exhibit #3)

15.     Dr. Benezra met with ZIM RVP Gary A. Fitzer in Dr. Benezra's hometown of Hillsborough NC on September 4, 2008. In that meeting, Dr. Benezra asked many specific questions about the statistics that were represented on the ZIR and ZIM websites.

16.     He was repeatedly assured that the statistics and data represented to prospective investors on the Zacks websites were, indeed, accurate, correct and predictive of the Zacks investment process.

17.     Thus, Dr. Benezra very reasonably concluded, through his face to face meeting with Fitzer and the representations made to him previously—via Zacks websites, Zacks advertising, in printed Zacks sales and marketing brochures, and in telephone conversations with Zacks representatives in Chicago—that Zacks had a process of buying and selling stocks that would guarantee Dr. Benezra of being invested in the top-rated #1 Rank stocks.

18.     Zacks researched a universe of over 4,000 stocks, for which it processed nearly 25,000 earnings estimate revisions weekly. The top-rated 5%, approximately 200 stocks, were the only ones accorded "#1 Rank" status. (Exhibit #4)

19.   **Through its representations to Dr. Benezra and all other prospective investor clients, Zacks guaranteed that all #1 Rank stocks would be purchased for each of its investment management clients**. (Emphasis added.)

20.   Zacks represented, through their scientific research, that they were able to identify the top 200, or 5%, of stocks most likely to make money for investors. They said this over and over to Dr. Benezra, and showed him the methodology and statistics to back up this claim regarding the #1 Rank stocks.

21.   Dr. Benezra evaluated all of this and relied upon such representations. He acted reasonably as a person and performed due diligence consistent with that of a prudent investor.

22.   Because of the Zacks representations, Dr. Benezra felt secure that he would be able to make a fair and secure return on his money.

23.   In reliance upon all such representations—the ZIM and ZIR websites, the statistical data, the personal meeting in North Carolina—Dr. Benezra proceeded to give $550,000 to Zacks Investment Management on September 30, 2008. (Exhibit #5).

24.   All of Zacks' representations were made with the intent to earn business in the State of North Carolina.

25.   At all times complained of herein, Zacks had offices in the State of North Carolina to acquire and handle business.

26.   At all times complained of herein, Zacks had personnel—Regional Vice Presidents ("RVP's")—, who lived in the State of North Carolina, conducted their business from offices in the State of North Carolina and were securities licensed in the State of North Carolina.

27.   At all times complained of herein, Zacks RVP's represented that Zacks had a large presence of business in the State of North Carolina, met with prospective clients to attempt to sell investment advisory services in the State of North Carolina and took tens of millions of dollars from residents of the State of North Carolina to invest.

28.     Zacks and its RVP's told clients that Zacks would safeguard the assets entrusted to them, thus honoring the fiduciary responsibility required by Zacks' Registered Investment Adviser (RIA) designation. Zacks told this to Dr. Benezra, and he signed reams of Zacks account papers.

## THE REPRESENTATIONS:

29.     Beginning in December, 2005 and running on a daily basis through March, 2009, Zacks conducted an "Own ALL the Zacks #1 Rank Stocks" advertising campaign. (Exhibit #6).

30.     Such promise to purchase for investors was further documented by Zacks' SEC-required Form ADV disclosure to clients. (Exhibit #7).

31.     Zacks' promise to purchase all its top-rated #1 Rank stocks became the cornerstone for all Zacks representations, marketing and advertising (orally, in print and online) to investment management prospects throughout all 50 states. For Zacks, leads like Dr. Benezra had become gold. In a few short years, Zacks raised $1 Billion from people who had submitted their names via the internet.

32.     Zacks' campaign was especially effective because Zacks simultaneously reported that the #1 Rank stocks had a 20-year performance history of returning over 30% annually.

33.     Thus, investors like Dr. Benzra saw something extremely unique in Zacks:

    a.     Proven research that identified the best money-making stocks (the "#1 Rank's")

    b.     An investment management service that guaranteed to buy all those top stocks

34.     Zacks backed up this claim with very detailed statistics. Zacks represented in all forms of communication that, year after year, Zacks Rank methodology was able to project the best of the best performing stocks, even in the worst of times. (Exhibit #8)

35.     Zacks represented that it would purchase for clients all the very best stocks it researched, the top 5% out of over 4,000—the #1 Rank's—for its investment management clients. Zacks represented this to lure customers into believing that they would be protected in all market conditions and economic environments by always owning approximately 200 of the very best stocks as determined by decades-long proven successful research.

36.     This is the heart and soul of the reason that Dr. Benezra gave $550,000 of his money to ZIM to invest, having been told that Zacks would constantly buy and sell, sell and buy, and otherwise actively manage his assets to keep him invested in the top 5%, the top 200, #1 Rank stocks. Zacks stressed that being fully invested in stocks at all times, and owning all the #1 Rank stocks, was especially important during difficult markets and challenging economic times like 2000-2002, and just like what was happening in 2008. (Exhibit #9)

37.     At all times complained of herein, Zacks made these representations for the purpose of inducing customers to hand over their funds and enter into written agreements for Zacks' investment advisory services.

38.     At all times complained of herein, Zacks knew that very intelligent people would be persuaded by these statistics and by these representations.

39.     At all times complained of herein, Zacks was not simply puffing but was presenting data as though it was scientifically derived, factually accurate and pertinent to the investment strategy.

40.     At all times complained of herein, Zacks was attempting to get money from people with these very clear representations.

7

41. Zacks made daily representations like these on March 4, 2008: *"Zacks #1 Rank stocks average a 32% annual return"* and *"Zacks Wealth Management: Own all the Zacks #1 Rank stocks in a portfolio managed by Zacks."* (Exhibit #10)

42. Zacks represented on April 9, 2008: **"Want to own ALL the Zacks #1 Rank Stocks?** *Mitch Zacks manages an exclusive portfolio for his private clients based on the Zacks #1 Rank Model. From 2002 through 12/31/07, this portfolio has outperformed the S&P 500 by a staggering 59.9%! Learn more in Your FREE Investment KIT that outlines Mitch's complete track record along with details on his time tested philosophy. Get Your FREE ZACKS INVESTMENT KIT."* (Exhibit #11)

43. Zacks further represented on August 19, 2008: *"ZACKS REVEALS THE MOST EFFECTIVE WAY TO BENEFIT FROM #1 RANK STOCKS. We would like to offer you a FREE KIT with details on how you can invest in a Quantitative Strategy **and own ALL the Zacks #1 Rank Stocks.** From 2002 through Q2 2008, this portfolio has outperformed the S&P 500 by a staggering 62.3%! Click Here for Your FREE ZACKS INVESTMENT KIT."* (Exhibit #12)

44. Only due to the representations that Zacks would buy all the top-rated #1 Rank stocks—the top 5% out of over 4,000 (approximately 200)—did Dr. Benezra agree to give $550,000 to Zacks.

45. ***But for the explicit and repeated representations that Zacks made to Dr. Benezra and the rest of the investing world, Dr. Benezra would NOT have placed his money with Zacks.***

46. At all times Dr. Benezra acted prudently, reasonably and properly in relying upon the representations of Zacks. Dr. Benezra believed all Zacks statistics, data and representations to be factual.

47. Had Dr. Benezra known, or should he ever have known, that Zacks was NOT going to buy him all the #1 Rank stocks as represented, he would NOT have given Zacks a penny, let alone $550,000.

48. Dr. Benezra was induced to part with his retirement savings based upon the representations made to him by Zacks, thus handing over his life savings and full discretionary trading authority to Zacks.

49. The only reason that Dr. Benezra parted with his retirement money was based upon the clearly printed representations by Zacks on what he would get. Such multiple repeated representations, in print and online, were buttressed and supported by telephone conversations, face to face statements, and representations to Dr. Benezra that Zacks would, indeed, purchase all the #1 Rank stocks for him.

50. Zacks knew that people would be lured by these representations. Dr. Benezra, a citizen of North Carolina, a Ph.D. chemist with advanced research and analytical skills, an astute investor, carefully researched the facts and was led to reasonably believe what he was buying, to wit: the very top 5%, or approximately 200 stocks, out of a universe of over 4,000 stocks that Zacks and the rest of the investment industry actively followed and analyzed.

51. Had Dr. Benezra thought otherwise, known otherwise, or had any reason to otherwise know that the Zacks representations were false, he would not have given anything to Zacks. For Dr. Benezra, the heart and soul of this business transaction was what he was buying. It was as though Dr. Benezra was told he was buying a $15,000 Rolex watch direct from the manufacturer. Instead, he got a $20 fake.

## THE FRAUD, THE BAIT AND SWITCH:

52. Zacks, in fact, did **NOT** buy *all* the top-rated #1 Rank stocks for Dr. Benezra. Zacks didn't buy Dr. Benezra *most, many* or even a *simple majority*, of the top 5% as promised. Zacks only bought Dr. Benezra a *few* of the approximately 200 #1 Rank stocks.

53.     Zacks knew it was all false. Zacks knew that what it advertised could not happen. Zacks knew that if it bought all the promised stocks, they'd drive the price up too high, artificially. Then, when Zacks went to sell, the bottom would fall out.

54.     Zacks knew this was impossible. The fraud and deceit was very, very clever.

55.     Zacks knew that, every day, it could identify the top 200 stocks and designate them as #1 Rank's. And Zacks knew that the #1 Rank's would make good money.

56.     So, that's what Zacks did. Zacks told everybody: "Look, here's the #1 Rank's. See how much money they make, 30% a year. Come here, we'll buy them for you."

57.     But, here's what Zacks NEVER told anyone: "Well, sorry—we really can't buy you *all* the #1 Rank's like we promised you." Or, "Actually—we won't be able to buy you *very many* of the #1 Rank's." Or, "You know what—*to tell you the truth, we know we can only buy you a few* of the #1 Rank's, despite what we've mislead you to believe." Zacks never told the truth.

58.     Zacks, with over $1Billion from thousands of investors like Dr. Benezra, knew it had too many dollars chasing too few small company stocks like those that dominated the #1 Rank list. Zacks knew it couldn't trade in and out of these thinly traded issues like promised. In fact, after the fraudulent scheme blew up, Zacks made two very telling disclosures:

   a.    Zacks amended its SEC-required Form ADV disclosure document to reflect its inability to purchase all the #1 Rank stocks (Exhibit #13)

   b.    Zacks authored an article detailing the fundamental reasons why Zacks couldn't purchase all the #1 Rank stocks (Exhibit #14)

59.     Still, driven purely by greed, Zacks was determined to create the illusion it was buying all these highly profitable stocks. So, here is how the fraud worked:

a.   "Investors, our proven #1 Rank strategy has produced a stellar 30% annualized return since 1988." (Exhibit #15)

b.   "We are the experts that have this figured out." (Exhibit #16)

c.   "If you (investors like Dr. Benezra) put your money with us, WE WILL BUY YOU **ALL** THE TOP-RATED #1 RANK STOCKS. Remember, these are the ones that have made 30% a year for 20 years." (Exhibit #17)

d.   "You can trust us. These performance numbers have been audited from 1995 through 2007 by Virchow, Krause & Company, LLP. (the 16th largest CPA firm in the United States)." (Exhibit #18)

60.   In fact, Zacks baited with the above, and then switched. Zacks did not, and could not, buy these stocks in large numbers and return 30%. It was untrue. It was fraud. Zacks knew it, yet they represented it to the public at large. (Exhibit #19)

61.   The evidence in this case will prove that:

a.   Zacks misrepresented its obligations to Dr. Benezra, and defrauded him and thousands of other investors.

b.   Zacks did NOT purchase the top-rated stocks they said they would. (Exhibit #20)

**THE RESULT:**

62.   As a result of this fraud, Dr. Benezra placed his retirement money with Zacks. He placed $550,000 with Zacks to invest and buy stocks that would result in these large gains and profit.

11

63.     Zacks did NOT buy for Dr. Benezra what it had represented. Instead Zacks just bought whatever stocks they could find in sufficient quantity—and started to lose money the first day, the second day, then day after day.

64.     Dr. Benezra became very concerned and called Zacks. Dr. Benezra spoke to Fitzer, the RVP in North Carolina, and asked what was going on. Zacks, through its agents, servants and others, kept telling Dr. Benezra that everything was okay and not to worry, and to stay the course.

65.     Dr. Benezra kept watching his account, believing that the top 200, the best 5% out of over 4,000, *all* the #1 Rank stocks, were in his account. He was wrong. There were lots of other stocks in his account, but only a few of the #1 Rank's.

66.     For weeks, Dr. Benezra's account continued to drop in value. Dr. Benezra couldn't make sense of it all. He suspected that something wasn't right. Dr. Benezra called and told Zacks to pull his cash out of the account and return his money to him on January 5, 2009. (Exhibit #21)

67.     As a proximate result of the fraud, Dr. Benezra suffered the loss, in just a few weeks, of $80,156.99.

68.     More than a year passed before Dr. Benezra found out, during late 2010, that, for a fact—with evidence—Zacks had not bought for him the top-rated stocks he was promised. He was outraged by this development. Dr. Benezra flatly stated, "I have been defrauded and lied to by this company." In fact, that is exactly what happened.

69.     Then later on, Dr. Benezra, after retaining counsel, found out that not only did Zacks not buy what they represented they would, but in fact, Zacks knew they could not.

70.     This was a double shock to Dr. Benezra. He was lied to about the stocks that Zacks bought for him, and lied to about the stocks Zacks *didn't* buy for him, and deceived into thinking that Zacks could weave this yarn into gold; they could not.

## FACTS ON JURISDICTION:

71.    The State of North Carolina has a long arm statute consistent with Constitutional restraints for due process and fair play.

72.    At all times, the State of North Carolina looks to a constellation of facts to see if due process under the Federal and State Constitutions will allow for a defendant headquartered in another state to be made to answer in the State of North Carolina.

73.    In the State of North Carolina, where a defendant, such as Zacks, makes representations in this state;

74.    In the State of North Carolina, where a defendant, such as Zacks, places into the stream of commerce, materials online and printed brochures in the mails, for review;

75.    In the State of North Carolina, where a defendant, such as Zacks, places offices in this state;

76.    In the State of North Carolina, where a defendant, such as Zacks, sends a Regional Vice President to meet with North Carolina clients;

77.    In the State of North Carolina, where a business sets up operations in this state, with licenses, which Zacks had for securities and investment management purposes; and Defendants, and each of them, made profits from doing business with people in the State of North Carolina.

78.    Clearly and unequivocally, the State of North Carolina will exert jurisdiction over the out of state defendant.

79.    Factually, the State of North Carolina has jurisdiction over Defendants Zacks. Due Process is satisfied.

## RESCISSION OF THE CONTRACT:

80.     In the State of North Carolina, a party may seek rescission of a contract. It is clear and unequivocal that there must be very powerful grounds to tear up a contract and file it in the wastebasket.

81.     One of the grounds for rescission is fraud in the inducement.

82.     Fraud in the inducement exists when the very heart and soul of the contract is fraudulent. Such fraud was part and parcel of Defendants' effort to lure the Plaintiff into signing a contract.

83.     Those facts exist here. Zacks lured Dr. Benezra by materially misrepresenting the true state of what they would do for him or any other clients.

84.     But for these deceitful lies, Dr. Benezra would never have put pen to paper and signed the contract.

85.     But for the deceitful advertising and personal representations, backed by extensive detailed data and statistics available online, Dr. Benezra would not have put pen to paper and signed the contract.

86.     Dr. Benezra is entitled to rescission under substantive law of the State of North Carolina.

87.     It is clear and unequivocal that fraud by Zacks voids this contract. Rescission is proper under these circumstances.

COMPLAINT FOR DAMAGES

## 1st (First) Cause of Action Against All Defendants

### (Fraud)

88.     Plaintiff incorporates by reference, the entire Preamble General Allegations, paragraphs 1 through 87, as though fully set forth herein.

89.     Plaintiffs Steven Benezra and Melissa York, by and through counsel, undersigned, complain of the Defendants, and each of them, as follows, for a Cause of Action for FRAUD:

90.     The Plaintiffs, Dr. Steven Benezra and his wife Melissa York, are decades-long citizens of the State of North Carolina and residents of Hillsborough NC in the County of Orange. At all times complained of herein, Defendants, and each of them, met with Plaintiffs in their home town of Hillsborough NC for purposes of inducing them to do business and to give monies to said Defendants.

91.     The Defendants, and each of them, conduct business nationwide, in all 50 states, including the State of North Carolina, as Zacks Investment Management, Inc. and Zacks Investment Research, Inc., and all other Zacks entities as described hereinabove, under the laws of the State of Illinois.

92.     The Defendants, and each of them, advertise in each of the 50 states, including the State of North Carolina.

93.     The Defendants, and each of them, caused, at all times complained of herein, volumes of advertising materials to be sent through the stream of commerce—online and in print via the mails—throughout all 50 states, to be read by individuals, especially the Plaintiffs.

94.     Defendants sent all aforementioned materials into interstate commerce in order to separate investors and retirees, such as Plaintiffs, from their retirement funds.

15

95. The Defendants, and each of them, at all times complained of herein, caused such advertising materials to be sent directly into the State of North Carolina, specifically for the purpose of inducing Plaintiffs to conduct business with, and surrender monies to, Defendants, and each of them.

96. The Defendants, and each of them, set up offices in the State of North Carolina, with staff, in order to conduct business in the State of North Carolina.

97. The Defendants, and each of them, set up offices with trained and licensed sales personnel, in the State of North Carolina, for the purpose of conducting their business to make money, profits and income for the Defendants, and each of them.

98. The Defendants set up phone numbers in the State of North Carolina so that people, like the Plaintiffs, would have direct access to the Defendants in doing business with the Defendants, and each of them.

99. Defendants, and each of them, are licensed in the State of North Carolina as Registered Investment Advisers, as required by the laws of the State of North Carolina.

100. Defendants, and each of them, hired licensed sales representatives, including Regional Vice Presidents (RVP's) of the Defendant companies, to physically meet with prospective investors, such as Plaintiff Dr. Steven Benezra.

101. Defendants, and each of them, established toll-free telephone numbers for people in the State of North Carolina to have direct contact with Defendant's agents, servants, employees and others who assisted Defendants in their scheme.

102. Defendants, and each of them, made profits from doing business with people in the State of North Carolina.

103. Defendants, and each of them, at all times complained of herein, ran a nationwide business with heavy marketing in the State of North Carolina, offices in the State of North Carolina, sales staff in the State of North Carolina, securities registration in the State of North Carolina and customer base in the State of North Carolina, all with the intent to fully conduct business with individuals in the State of North Carolina.

104. Defendants, and each of them, even went so far as to send a Regional Vice President to meet in person with Plaintiff Dr. Steven Benezra, to discuss the Defendant's business plan and investment advisory services, to communicate data, make material representations to the Plaintiff, Dr. Benezra, and to further induce Dr. Benezra and his family to place monies with Defendants.

105. Plaintiff Dr. Benezra met with RVP Fitzer of Defendants, and each of them, in Dr. Benezra's home town of Hillsborough NC.

106. At all times complained of herein, Dr. Benezra relied upon Defendants, and each of them, from written materials presented to him, conversations over the telephone with him and personal meetings in his home city.

107. Plaintiffs, at all times, viewed Defendants, and each of them, as a company doing business in North Carolina and nationwide.

108. Defendants, and each of them, are in the business of stock and securities research, analysis, investment advising, and the actual taking of people's money to invest in stocks and other investments.

109. Defendants, and each of them, made material representations to the Plaintiff, Dr. Benezra, about the value and benefit of investing money with Defendants, and each of them. Defendants took Plaintiff's money on or about September 30, 2008, with full intent to misuse and misappropriate, which they did.

110. Defendants, and each of them, made material representations to the Plaintiff, Dr. Benezra, about the past history of individuals investing in Defendants' stocks and other securities.

111. Defendants, and each of them, made material representations to Plaintiffs and others that, if Plaintiffs invested money with Defendants, Plaintiff's money would be invested in a special group of stocks that only Defendants, and each of them, were able to identify and purchase for the Plaintiffs.

112. Such special group of stocks, that only Defendants, and each of them, could purchase for Plaintiffs, were represented as having made over 30% per year on average for the past 20 years.

113. Such special group of stocks, Defendants, and each of them, further represented as having made over +39% positive return during the disastrous 2000-2002 dot.com bust which sent the stock market crashing down by over -43%.

114. Defendants, and each of them, made these material representations about the expected growth of Dr. Benezra's monies with the specific intent to induce Dr. Benezra to place his retirement monies with Defendants.

115. Defendants, and each of them, made material representations about stocks they would buy for Plaintiffs, and others similarly situated, with the intent to induce Plaintiffs to place their monies with the Defendants.

116. Defendants, and each of them, materially represented specific stocks and securities they would buy for the Plaintiffs and others with the undeniable intent to induce the Plaintiffs, and others similarly situated, to place their monies, and/or retirement funds, with Defendants.

117. Defendants, and each of them, in their representations, knew, and should have known, that they did not intend to acquire, purchase or control the stocks and securities that Defendants said they would. Defendants knew, at the time they represented they would buy the top 5%, or 200, #1 Rank stocks most likely to make money, that such representations, which were clear and unequivocal, as evidenced by their written materials, were false.

118. Defendants made the representations, as set forth in paragraph 35, knowing that they, the Defendants herein, could not acquire for the Plaintiffs the top stocks and securities, but, rather, made these statements, representations and inducements with the specific intent of luring and inducing the Plaintiffs, and others similarly situated, to place their monies and retirement funds with the Defendants.

119.    Defendants, and each of them, knew that their statements were false and misleading, constituted false advertising and, as later committed to writing, explained the reality of why they could not do with Plaintiff's funds what Defendants had represented.

120.    Defendants knew, and should have known, that the false and misleading statements made to Plaintiffs and others similarly situated, would act as a financial lure, and be acted upon by Plaintiffs and others similarly situated.

121.    Defendants, and each of them, represented that they would buy certain very specific top-rated stocks for Plaintiffs and others.

122.    Defendants did NOT buy these stocks for Plaintiffs as they represented that they would.

123.    Defendants, at all times complained of herein, knew at the time of such representations, that they would NOT buy these stocks and securities for the Plaintiffs and others similarly situated.

124.    Defendants, and each of them, knew at the time they made these representations, in the State of North Carolina, that they not only would not, but could not, buy for Plaintiffs, and others similarly situated, those top-rated stocks that they promised they would.

125.    Defendants, and each of them, instead, bought large numbers of lower-rated stocks for the Plaintiffs that did not perform at all like they had represented.

126.    Defendants, and each of them, made each and all of these false representations over and over in written materials, phone calls, online presentations, personal meetings and other fashions, which they knew were false, and which they knew were materially false with the INTENT to induce reliance by Plaintiffs and others similarly situated.

127.    At all times complained of herein, Defendants materially misrepresented, to the Plaintiffs, the truth about the stocks and securities they would purchase and did purchase,

knowing that the Plaintiffs would rely upon these false, misrepresented and untrue statements.

128.    Plaintiffs at all times relied reasonably and factually upon the representations made by Defendants, and each of them. Plaintiffs not only relied upon the representations reasonably from an objective standard, but further relied upon them factually from a business analysis of the facts by the Plaintiffs, based upon the representations by the Defendants.

129.    At all times complained of herein, Plaintiffs, in relying upon the representations of the Defendants, and each of them, took money from their retirement savings and placed the sum of $550,000 with the Defendants, and each of them, to "Own ALL the Zacks #1 Rank Stocks" as represented by Defendants.

130.    Defendants, and each of them, took the Plaintiffs' $550,000 and, against proper legal and ethical counsel, financial advice and representations, both material and factual, misappropriated Plaintiff's funds. Defendants, and each of them, instead of placing Plaintiffs' money in the stocks Defendants said they would, bought other lower-rated stocks that did not perform the way it had been represented.

131.    Defendants misappropriated the funds of the Plaintiffs and bought inferior stocks that Defendants knew would NOT perform the way they represented. Defendants bought stocks that in fact went DOWN in value. Defendants never told, warned, advised, suggested or gave any notice, informed consent, or any other or factual notice, prior to acquiring these inferior stocks.

132.    Had Plaintiffs known of this course of conduct, plan, scheme and design, Plaintiffs would never have transferred retirement funds to Defendants, and each of them, for purposes of using their money in a fashion that they neither approved, nor understood or had any warning.

133.    At all times Plaintiffs reasonably relied upon the representations of the Defendants, and each of them, in transferring money to the Defendants.

134.   At all times complained of herein, Plaintiffs have suffered damages in excess of the court's minimum jurisdiction.

135.   Defendants, at all times complained of herein, have acted with malice, deceit, fraud and misrepresentation, with the specific intent to defraud and steal money from the Plaintiffs. Defendants knowingly have stolen money from the Plaintiffs.

136.   Based upon this intentional, tortious, criminal and fraudulent conduct, Plaintiffs are entitled to punitive damages against the Defendants, and each of them, to set an example in the State of North Carolina, that the courts and citizens will not tolerate Defendants, such as these, from coming into this state and defrauding and stealing from individuals, such as Plaintiffs and those similarly situated.

137.   Plaintiffs have lost actual damages, in excess of the minimum jurisdiction of this court, and which will be the subject of discovery and proven at the time of trial on this matter.

138.   Plaintiffs will discover and prove the proper amount of punitive damages to be awarded against the Defendants, and each of them, in full conformity with the guidelines set forth by the United States Supreme Court and the Reviewing courts of the jurisdiction of the State of North Carolina.

139.   As a direct and proximate result of the fraudulent and illegal conduct of the Defendants, and each of them, Plaintiffs have been injured and damaged under the laws of the State of North Carolina, and will prove said injury and damages in discovery and trial.

## 2nd (Second) Cause of Action Against All Defendants

### (Rescission)

140.  As a Second Cause of Action, Plaintiffs incorporate by reference, each and every paragraph of the General Preamble Allegations, Paragraphs 1 through 87, and each and every paragraph of the First Cause of Action for Fraud, paragraphs 88 through 139, as though fully set forth herein.

141.  At all times complained of herein, the Jurisdiction of the State of North Carolina recognizes a cause of action for Rescission.

142.  At all times complained of herein, the State of North Carolina recognizes a cause of action for Rescission based upon Fraud in the Inducement.

143.  At all times complained of herein, Defendants, and each of them, intentionally, and with malice aforethought, defrauded Plaintiffs.

144.  Defendants, and each of them, required Plaintiff Steven Benezra to sign large numbers of papers, purporting to be a contract, and other documents, in order to commence their fraudulent and criminal transaction.

145.  Plaintiff Steven Benezra did, in fact, sign many papers, including what would otherwise purport to be a written form, a boilerplate agreement, by and between himself and Zacks Investment Management, Inc. and all the Defendants, and each of them, as agents, servants, employees, alter egos, borrowed servants, and others legally responsible for the papers that Plaintiff Steven Benezra signed.

146.  But for the fraudulent, tortious, criminal and conspiratorial conduct of Defendants, and each of them, Plaintiff Steven Benezra NEVER would have signed all these papers.

147.  But for the fraudulent, tortious, criminal and conspiratorial conduct of Defendants, and each of them, Plaintiffs not only would NOT have engaged the services of Defendants, and each of them, Plaintiffs NEVER would have placed his money with

the Defendants, nor would Plaintiff Steven Benezra have signed ANY documents, purported agreements, forms, papers, or anything whatsoever placed on paper in writing by the Defendants, and each of them.

148. But for the fraudulent, tortious, criminal and conspiratorial conduct of Defendants, Plaintiffs would never have given any outward approval to any of the employees, principals, partners, shareholders, agents, servants, stockholders or others affiliated with, working for, or legally aligned with Defendants, and each of them, to proceed with acquiring the erroneous and improper stocks and securities which Defendants DID, in fact, procure.

149. At all times complained of herein, consent and signing of papers by Plaintiff Steven Benezra was procured by fraud, with the result that his signing was not given legally, properly, or with proper factual or legal consent, and therefore is not binding upon the parties, the world, the individual Plaintiffs, nor each and every Defendant, by and through its principals, partners, shareholders, investors, agents, servants, employees, limited partners or any other individual or individuals anywhere, for any purpose whatsoever.

150. As such, the placing of pen to paper by Plaintiff Steven Benezra is void as a matter of law, in that he did not have the scienter, knowledge, proper facts, free will, consent or legal capacity with proper knowledge, none of which he caused or contributed to, to sign said documents.

151. As such, this court, which in the State of North Carolina has the powers of Law and Equity, has facts sufficient to justify an order of total rescission of this purported contract and all other documents signed by Plaintiff Steven Benezra. Plaintiffs pray for rescission of ALL documents signed by Plaintiff, as having been fraudulently and otherwise tortiously procured by the Defendants, and each of them.

152. As a direct and proximate result of the tortious conduct of Defendants, and each of them, in addition to rescission of the documents and/or purported contracts, Plaintiffs are entitled to actual and compensatory damages for their loss occasioned by the

aforementioned conduct of the Defendants, and each of them, said sums to be adduced through discovery and proven at the time of trial of this matter.

153.    As a direct and proximate result of the tortious conduct of the Defendants, and each of them, Plaintiffs are entitled to punitive damages, as authorized by Mehovic v. Mehovic, 133 N.C. App. 131, 514 S.E.2d 730 (1999); N.C. Gen. Stat. § 1D-15(a)(2) (2007) when rescinding this fraudulent transaction and signing of papers by Plaintiff Steven Benezra, which proximately caused him actual monetary damages, for which Plaintiffs are also entitled to punitive damages within the jurisdiction of this court, which are within the guidelines of the United States Supreme Court, and the Reviewing Courts of the State of North Carolina.

154.    Plaintiffs are entitled to have the court, upon trial of this matter, have the documents signed by Plaintiff, including, but not limited to, purported agreements and/or contracts**, rescinded**, and place the parties in the position as though they never had any written documents signed by either or all of the parties.


### 3rd (Third) Cause of Action Against All Defendants

### (Breach of Fiduciary Duty)

155.    Prohibited Transactions by Investment Advisers, Section 206 of the Investment Advisers Act of 1940 15 U.S.C. § 80b-6, provides in pertinent part:

>    "It is unlawful for any investment adviser, by use of the mails or any
>    means or instrumentality of interstate commerce, directly or indirectly--to
>    employ any device, scheme, or artifice to defraud any client or prospective
>    client; to engage in any transaction, practice, or course of business which
>    operates as a fraud or deceit upon any client or prospective client; acting
>    as principal for his own account, knowingly to sell any security to or
>    purchase any security from a client, or acting as broker for a person other

than such client, knowingly to effect any sale or purchase of any security for the account of such client, without disclosing to such client in writing before the completion of such transaction the capacity in which he is acting and obtaining the consent of the client to such transaction. The prohibitions of this paragraph (3) shall not apply to any transaction with a customer of a broker or dealer if such broker or dealer is not acting as an investment adviser in relation to such transaction; to engage in any act, practice, or course of business which is fraudulent, deceptive, or manipulative. The Commission shall, for the purposes of this paragraph (4) by rules and regulations define, and prescribe means reasonably designed to prevent, such acts, practices, and courses of business as are fraudulent, deceptive, or manipulative."

156.    Plaintiffs incorporate, by reference herein, the entire General Preamble Allegations, in paragraphs 1 through 87.

157.    At all times complained of and alleged herein, Defendant Zacks Investment Management, Inc., and each and every Defendant, owed a fiduciary duty to Plaintiffs, and all others similarly situated, to use that degree of skill, learning, intelligence, care, trust, competence, advice, counsel and caution in taking money from Plaintiffs, to manage that money with the highest degree and skill provided by law to protect the money, retirement funds, and assets of the Plaintiffs, and those similarly situated, so as to ensure that nothing harmful, untoward, or negative happened to the monies and assets of the Plaintiffs and others for whom they held and invested such.

158.    At all times complained of herein, Defendant Zacks Investment Management, Inc., and each and every other Defendant, owed a duty to Plaintiffs to disclose honest, accurate and reasonable information to the Plaintiffs, and others similarly situated, as to what they intended to do with the monies obtained from the Plaintiffs.

159.    At all times complained of herein, Defendant Zacks Investment Management, Inc., and each and every other Defendant herein, owed a duty to Plaintiffs to disclose the reasons and rationales for that which they were intending to do and, in fact, did do, with the monies of the Plaintiffs.

160.    Defendants, and each of them, failed to tell, advise, counsel, explain, disclose, detail or otherwise communicate any and all facts, important information, or any material information whatsoever, so that Plaintiffs would know the true state of affairs in what Defendants were actually doing with their money. Plaintiffs assumed that, per the myriad amount of representations, Defendants were purchasing certain specific top-rated stocks.

161.    Defendants, and each of them, breached their fiduciary duty to the Plaintiffs, by not properly advising, disclosing, explaining, accounting, discussing or otherwise communicating to Plaintiffs the true state of their investments, nor what they were going to do with the monies received by the Defendants, and each of them.

162.    As a proximate result of the breach of the fiduciary duty owed to the Plaintiffs, and each of them, Plaintiffs are entitled to actual damages according to proof, within this court's jurisdiction.

163.    As a proximate result of the breach of the fiduciary duty owed to the Plaintiffs, and each of them, Plaintiffs are entitled to exemplary damages so as to set an example to the business world, so that other similarly situated individuals will not be harmed in a similar fashion.  Plaintiffs will obtain through discovery, and prove at trial, a sum consistent with the guidelines as set forth by the U.S. Supreme Court and the Reviewing Courts of the State of North Carolina.

## 4th (Fourth) Cause of Action Against All Defendants

### (Violation of the Securities Exchange Act of 1934)

164.    Rule 10b-5: Employment of Manipulative and Deceptive Devices, provides in pertinent part:

> "It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange, to employ any device, scheme, or artifice to defraud, to make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or to engage in any act, practice or course of business which operates, or would operate, as a fraud or deceit upon any person in connection with the purchase or sale of any security."

165.    Plaintiffs incorporate, by reference herein, the entire General Preamble Allegations, in paragraphs 1 through 87, and the entire First Cause of Action for Fraud, paragraphs 88 through 139, as though fully set forth herein.

166.    At all times complained of herein, Defendants were, and are, required to comply with the terms and conditions, and mandates of the Securities and Exchange Act of 1934, and Rule 10b-5.

167.    At all times complained of herein, Defendants owed a legal duty and obligation to the Plaintiffs, and all others similarly situated, to comply with the terms, conditions and mandates of the aforementioned Federal Law and Federal Regulations.

168.    Defendants, and each of them, employed devices, schemes, and artifices with the intent to defraud the Plaintiffs, and each of them, by making untrue statements of material facts and, in addition, by omitting to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made,

misleading; and by engaging in acts and practices, and a course of business which operated as a fraud and deceit upon the Plaintiffs, and each of them.

169.　All of the aforementioned actions, as particularly described and complained of herein, in paragraphs 1 through 161, were in connection with the purchase and sale of securities that Defendants, and each of them, purchased, sold and/or represented that Defendants were purchasing and/or selling for the Plaintiffs.

170.　As a proximate result of the violations of Rule 10b-5, a duty owed to the Plaintiffs, and each of them, Plaintiffs are entitled to actual damages, according to proof, within this court's jurisdiction.

171.　As a proximate result of the violations of Rule 10b-5, a duty owed to the Plaintiffs, and each of them, Plaintiffs are entitled to exemplary damages so as to set an example to the business world, so that other similarly situated individuals will not be harmed in a similar fashion. Plaintiffs will obtain through discovery, and prove at trial, a sum consistent with the guidelines as set forth by the U.S. Supreme Court and the Reviewing Courts of the State of North Carolina.

## 5th (Fifth) Cause of Action Against All Defendants

### (Violation of the North Carolina Securities Act)

172.　North Carolina General Statutes § 78A-8 Sales and Purchases, provides in pertinent part:

> "It is unlawful for any person, in connection with the offer, sale or
> purchase of any security, directly or indirectly to employ any device,
> scheme, or artifice to defraud, to make any untrue statement of a material
> fact or to omit to state a material fact necessary in order to make the
> statements made, in the light of the circumstances under which they are

made, not misleading or, to engage in any act, practice, or course of business which operates, or would operate, as a fraud or deceit upon any person. (1973, c. 1380.)

173.    Plaintiffs incorporate by reference herein the entire General Preamble Allegations, in paragraphs 1 through 87, and the entire First Cause of action for Fraud, paragraphs 88 through 139, as though fully set forth herein.

174.    At all times complained of herein, Defendants were and are required to comply with the terms and conditions, and mandates of North Carolina Securities Act, Article 2 Fraudulent and Other Prohibited Practices, General Statutes § 78A-8, Sales and Purchases.

175.    At all times complained of herein, Defendants owed a legal duty and obligation to the Plaintiffs, and all others similarly situated to comply with the terms, conditions and mandates of the aforementioned State Law and State Regulations.

176.    Defendants, and each of them, employed devices, schemes, and artifices with the intent to defraud the Plaintiffs, and each of them, by making untrue statements of material facts and, in addition, by omitting to state material facts necessary in order to make the statements made, in light of circumstances under which they were made, misleading; and by engaging in acts and practices, and a course of business which operated as a fraud and deceit upon the Plaintiffs and each of them; all in violation aforementioned statute.

177.    All of the aforementioned actions as particularly described and complained of in paragraphs, 1 through 169, herein, were in connection with the purchase and sale of securities that Defendants and each of them, did purchase, did sale and or represented they were purchasing and/or selling for the plaintiffs.

178.    As a proximate result of the violation of the North Carolina Securities Act, Article 2 Fraudulent and Other Prohibited Practices, General Statutes § 78A-8, Sales and

Purchases, a duty owed to the Plaintiffs, and each of them, Plaintiffs are entitled to actual damages according to proof, within this court's jurisdiction.

179.    As a proximate result of the violation of the North Carolina Securities Act, Article 2 Fraudulent and Other Prohibited Practices, General Statutes § 78A-8, Sales and Purchases, a duty owed to the Plaintiffs, and each of them, Plaintiffs are entitled to exemplary damages so as to set an example to the business world, so that other similarly situated individuals will not be harmed in a similar fashion. Plaintiffs will obtain through discovery, and prove at trial, a sum consistent with the guidelines as set forth by the U.S. Supreme Court and the Reviewing courts of the state of North Carolina.

180.    As a proximate result of the violation of the North Carolina Securities Act, a duty owed to the Plaintiffs, and each of them, Plaintiffs are entitled to actual damages according to proof, within this court's jurisdiction.

181.    As a proximate result of the violation of the North Carolina Securities Act, and each of them, Plaintiffs are entitled to exemplary damages so as to set an example to the business world, so that other similarly situated individuals will not be harmed in a similar fashion. Plaintiffs will obtain through discovery, and prove at trial, a sum consistent with the guidelines as set forth by the U.S. Supreme Court and the Reviewing courts of the state of North Carolina.

## 6th (Sixth) Cause of Action Against All Defendants

### (Unfair and Deceptive Trade Practices)

182.    The North Carolina  Unfair and Deceptive Trade Practices Act § 75-1.1(a) provides in pertinent part:

> "Unfair methods of competition in or affecting commerce, and unfair or deceptive acts or practices in or affecting commerce, are declared unlawful."

183.    All of the aforementioned actions, as particularly described and complained of herein, in paragraphs 1 through 181, were in connection with the purchase and sale of securities that Defendants, and each of them, purchased, sold and/or represented that Defendants were purchasing and/or selling for the Plaintiffs.

184.    At all times complained of herein, Defendants Zacks, and each of them, engaged in not only unfair, but deceptive acts and practices that affect interstate commerce as fully and thoroughly set forth in the General Preamble Allegations and the First Cause of Action for Fraud.

185.    As a proximate result of the violation of the North Carolina Unfair and Deceptive Trade Practices Act, a duty owed to the Plaintiffs, and each of them, Plaintiffs are entitled to actual damages, according to proof, within this court's jurisdiction.

186.    As a proximate result of the violations of the North Carolina Unfair and Deceptive Trade Practices Act, a duty owed to the Plaintiffs, and each of them, Plaintiffs are entitled to exemplary damages so as to set an example to the business world, so that other similarly situated individuals will not be harmed in a similar fashion.  Plaintiffs will obtain through discovery, and prove at trial, a sum consistent with the guidelines as set forth by the U.S.  Supreme Court and the Reviewing Courts of the State of North Carolina.

### 7th (Seventh) Cause of Action Against All Defendants

**(Declaratory Relief)**

187.    Plaintiffs incorporate by reference, paragraphs 1 through186, as though fully set forth herein.

188.    Plaintiffs, and each of them, were defrauded, and therefore, the signing of papers by them is void, and/or voidable. Plaintiffs seek a declaration of their rights and responsibilities to the Defendants, and each of them, so as to undo, rescind, avoid, and/or void the paperwork which would purport to set forth contractual rights and responsibilities by and between the parties. All such signing of papers and paperwork is null, void, and/or voidable, with no legal effect in equity, by and between the Plaintiffs and the Defendants.

# A.    CLEAR AND UNEQUIVOCAL RIGHT TO SELECT JUDGE AND JURY

189.    Defendants preserved the right for Plaintiffs to bring suit in court, and not arbitrate.

190.    At all times complained of herein, Defendants Zacks, and each of them, authored, wrote, prepared and set forth to Plaintiffs that they, Plaintiffs, had a clear right to proceed to enforce their rights and remedies against Zacks, and each of them, in court. Defendants stated such clearly, unequivocally, and without hesitation; not one time, but two times, in their Investment Advisory Agreement "IAA", in pertinent part:

…*"Nothing in this agreement shall in any way constitute a waiver or limitation of any rights that I may have under any applicable securities laws."* **(IAA page 3, paragraph 9)** (See attached Exhibit #22)

*AND*

**(IAA page 5, paragraph 21): "<u>Nothing</u> in this Agreement shall constitute a <u>waiver</u> or limitation of any rights I may have under applicable securities laws or regulations."**

191.    At all times complained of herein, Defendants Zacks, in paragraph 9 of the IAA, *Standard of Care*, and paragraph 21 of the IAA, *Construction*, clearly stated the Defendants' intent. These paragraphs are precise and not subject to any interpretation. They say what they mean in plain understandable language.    NOTHING IN THE IAA DOCUMENT SHALL TAKE AWAY RIGHTS, INCLUDING THIS DOCUMENT, TO:

      i.       Go to court

      ii.      File suit in court

      iii.     Try the case in court

      iv.     Exercise appellate rights

      v.      Recover exemplary or punitive damages

192.    These are rights provided by securities laws. Zacks made this clear and concise, not once, but TWICE, in the IAA document.  In the most plain language imaginable, Defendants, and each of them, were saying to plaintiff in so many words:

    *"Mr. Benezra, if we do wrong, no matter what we say, you can have your lawyer sue us in court under Federal and North Carolina State Securities*

*laws, which DO give you the right to go to court, and to have the right to a*
*judge and jury, and appeal if you feel error was committed."*

193.     There is no other intelligent reading of these 2 sentences.  They were put in to advise and reassure Plaintiff that he was not giving up anything, especially any waiver of securities rights, which include the Constitutional right to access to the courts.

194.     At all times complained of herein, Defendants Zacks put in a paragraph regarding the issue of Arbitration, paragraph 18, page 4 of the IAA, which purported to seek a waiver by Plaintiffs, and each of them, "….to seek remedies in any court or before any government agency….". Such language is in disagreement with the aforementioned paragraphs (paragraph 9 and paragraph 21 of the IAA) and, therefore, is null and void, as is the entire paragraph.

195.     As shall be pled infra, Defendants also attempted to take away Plaintiff's right to complain to the Federal Bureau of Investigation (FBI), Securities and Exchange Commission (SEC), North Carolina Securities Division, and other agencies that protect victims of securities fraud, such as Plaintiff herein. Such deceit is unlawful, unethical, immoral, and quasi criminal. No one, not even Defendants herein, can take away Plaintiff's right to complain and seek redress of remedies for criminal conduct.

196.     Plaintiff, a Ph.D., learned and cautious, at all times reasonably and clearly understood the statements in paragraphs 9 and 21 as preserving his right to jury trial and enforcement of securities laws, as legally and ethically required of Defendants Zacks, from whom a fiduciary duty is required. Section 211(g). STANDARD of CONDUCT of the Investment Advisers Act of 1940 states in pertinent part:

> **"….shall be to act in the best interest of the customer WITHOUT REGARD TO THE FINANCIAL OR OTHER INTEREST OF THE BROKER, DEALER, OR INVESTMENT ADVISER PROVIDING THE ADVICE."**

197.    Defendants Zacks, in trying to keep clients, such as Plaintiff, out of court, are in clear violation of the law and neglect of the fiduciary duty owed Plaintiff. Thus, Plaintiff preserves his Constitutional rights to the courtroom and, seeks redress of all wrongs under securities laws.

198.    At all times complained of herein, Defendants, and each of them, were saying in plain, clear and unmistakable English:

> *"Dr. Benezra, we want you to know that, even though we put in this*
> *Arbitration Clause, NOTHING, including the Arbitration Clause itself,*
> *shall have the effect of taking away your rights to seek redress of wrongs,*
> *under any and ALL securities laws, including the rights to court, judge,*
> *jury and punitive damages."*

> *"We put the Arbitration Clause in as an option for you. You can accept it*
> *or not. In fact, Dr. Benezra, we want you to feel so safe and secure that we*
> *are being ethical so, not wanting to take advantage of you in any way, WE*
> *PUT THIS LANGUAGE IN HERE TWICE!(paragraphs 9 and 21) not just*
> *once, but TWICE!"*

> *"In fact Dr. Benezra, we wanted you to feel so safe and protected in your*
> *legal rights to come after us, if we ever do wrong to you and your wife,*
> *that we used the strongest words possible to protect you:*

>> **"Nothing in this Agreement** (*including the Arbitration*
>> *Clause*) **shall** (*imperative, not optional to us, but to you,*
>> *Dr. Benezra!*) **constitute a waiver or limitation of any**
>> **rights!"**

199.    For Plaintiff Dr. Benezra, any rights would include the right to the Federal or State Courts, jury trial, punitive damages, going to the FBI, SEC, North Carolina Securities Division and so forth.

200.    In addition to the aforementioned paragraphs, there is yet another paragraph that clearly establishes Defendants, and each of them, giving to themselves, and to Plaintiffs, the right to proceed to court rather than arbitration.  In paragraph 10, page 3 of the IAA, it is stated in pertinent part:

> "....in the final judgment of a court (not arbitrator) of competent jurisdiction (which this federal court is one such court), it is adjudicated (evidence is heard and ruled upon) that (i) your (Zacks') action or omission resulted in the violation of the provisions of this Agreement or applicable law, or (ii) your (Zacks') action or omission constituted negligence or malfeasance with respect to your (Zacks') obligations and duties under this Agreement."

201.    The above referenced quotation means, in plain English: "Dr. Benezra, both parties can go to court (not arbitration) for the court to hear evidence, and make rulings as to whether the conduct of Defendants Zacks, and each of them, was in violation of securities laws, or constituted negligence.  Each of us can put on a case for this."

202.    Clearly and unequivocally, Zacks, in drafting this document, was giving to itself and to Plaintiffs, the right to go to court and determine whether Zacks broke the law. This clear language is not ambiguous, and must be construed in the light most favorable to the Plaintiffs.

203.    If Defendants were to claim that they had a unilateral right to go to court, and Plaintiffs could not, such claim would clearly be unconscionable and unenforceable. Defendants meant what they said, that either of us can go to court and litigate whether Zacks is liable for securities fraud and/or common law malfeasance.

204.    At all times complained of herein, the aforementioned paragraphs are so clear that Plaintiff asks for a Declaration of the obvious:

"The court hereby orders that Defendants Zacks clearly, unequivocally and unmistakably, gave the right, under their IAA document, to Plaintiff Benezra to seek court remedies, at their election, rather than Arbitration. Thus, the court hereby denies the motion to compel arbitration and orders this matter to be placed on the trial calendar."

## B.   Even if Defendant argues ambiguity, Plaintiff retains the right to court rather than Arbitration.

205.   Plaintiffs seek a Declaration that, even if Defendant argues that the aforementioned paragraphs of the IAA, paragraphs 9, 10, 18 and 21, are in conflict, thus creating an ambiguity, ANY and ALL ambiguities are construed against the Defendants, and each of them.

206.   At all times complained of herein, Plaintiffs assert that the abovementioned paragraphs are clear and simple. The words "**Nothing Shall Constitute a Waiver or Limitation of ANY Rights**" cannot be argued. "N-o-t-h-i-n-g" means **NOTHING**. "Nothing shall constitute a waiver" means that nothing, not even the illegal purported Arbitration Clause, can bring about a waiver of the right to the court here in the Middle District of North Carolina.

207.   Notwithstanding the aforementioned, Defendants wish to further torture the English language and say:

> *"No, there are 2 ways to look at this document, and we want the court to elect our interpretation, which is to say that we go to Arbitration. After*

37

*all, the courts have ruled over and over that, if there is a valid Arbitration Clause, a person gives up their rights to court".*

208.   Plaintiffs, and each of them, agree that the following is true and correct:

Plaintiff could select one of the two Zacks options, and not go to court. That did not happen herein. Plaintiff, at all times, was given the option by the Defendants, and each of them. Plaintiffs opt for the court, and not Arbitration. It is the Defendants, and each of them, that put this language into the Agreement.

209.   At all times complained of herein, in this request for Declaratory Relief, the court is well aware that, in the event there is any ambiguity in a document, THE COURT MUST (EMPHASIS ADDED) interpret the document against the author/creator, and in favor of the one who did not create the document.

210.   At all times complained of herein, Plaintiffs maintain that the document is clear, without any other meaning than hereinafter averred and stated. However, Defendants, and each of them, in their motion to compel arbitration, interpret the IAA differently. The Court is therefore requested to read the document and rule in the Plaintiffs' favor, but, should the court ponder the issue and find there is an ambiguity, rule as follows:

"The court agrees with the Plaintiffs in their interpretation of the document. However, the court has read the motion to compel arbitration and finds that, by said motion, Defendants are attempting to create an ambiguity in the contract. As such, even if there is an ambiguity, and since the Plaintiffs' position is correct, the ambiguity that Defendants attempt to create is held against the Defendants, and in favor of the Plaintiffs. The court therefore finds that the three paragraphs, paragraphs 9, 10 and 21, maintain the rights for Plaintiffs to proceed to court. The Defendants drafted this document, and they are bound by their clear language, not by the more general principle, in a vacuum, that Arbitration is favored. The motion to compel is denied, and Plaintiffs may proceed to trial."

## C. Declaration that Zacks perpetrated Fraud in the Inducement of the Arbitration Clause and therefore must proceed to court and not Arbitration.

211. Plaintiffs incorporate by reference, paragraphs 1 through 87, and paragraphs 88 through 139, as though fully set forth herein.

212. Plaintiffs were induced fraudulently, by Defendants, in an effort to sign the Arbitration Clause. Plaintiffs state that Defendants Zacks, and each of them, planned, schemed and designed a clever fraud. The fraud was extraordinary. Defendants, and each of them, in a most craftily worded advertising campaign, printed supporting material to con/lure people into giving Defendants money. Dr. Benezra is a highly intelligent doctor of biochemistry. He knows how to read. He understands statistics. Dr. Benezra himself was conned into giving his money to Defendants Zacks, and each of them. Plaintiff was duped by this entire fraud.

213. At all times complained of herein, Defendants, and each of them, knew of their fraudulent scheme. Defendants, and each of them, knew that Zacks, at one time, was one of the most trusted names in the securities world. Defendants knew that, by placing statistics and representations of: a) annualized 30% returns for #1 Rank stocks followed by: b) Own ALL the #1 Rank Stocks acquisition promises (which Defendants represented that they would do, but did not do – because Defendants could NOT do this) Defendants would get people to part with their money.

214. At all times complained of herein, Defendants, and each of them, planned for the question of: "What do we do if we get caught? How do we protect ourselves for the day when we will surely be found out?" Defendants Zacks, and each of them, thought about

this question, and decided to further defraud investors and Plaintiffs herein. How did they do this? Here is the fraud in the inducement to the Arbitration Clause:

A.    Zacks had already concocted a fraud scheme, to take money from people, with lies and false promises.

B.    Zacks decided to put in an Arbitration Clause, to limit Defendants' liability, especially the right to come after them to expose their fraud and have a jury hear this, and exclude punitive damages, which they knew would be assessed against them when found out.

C.    In addition, Zacks put in language to try to prevent Plaintiffs, and others similarly situated, from contacting the FBI, SEC, North Carolina Securities Division and others, so as not to complain against Defendants Zacks, and each of them. In other words, Defendants said, "Hey, clients might want to blow the whistle on us. They may want to seek remedies from the Feds, etc. We can't have that. So let's include an Arbitration clause with the intent of taking away those rights and remedies. The clause will state that investors waive their rights to court access, and we will force them to Arbitration, and take away their rights to punitive damages. However, we will include other language (paragraphs 9, 10 and 21) throughout the contract that will bolster our clients' confidence and sense of security by saying that all their rights will be preserved. We will employ spaced repetition of the idea of preserving their rights, thus fostering feelings of safety and protection. We will include statements preserving their rights in the IAA Agreement before they read the Arbitration clause (paragraphs 9 and 10 of the IAA) and we will include statements after the Arbitration clause to

reinforce this false idea (paragraph 21). See, when we get caught, and we surely will (Dr. Benezra has caught them), we will be hit for punitive damages. If our clients try to take us to court, we will point to the Arbitration clause, forcing them out of the court system and into Arbitration, while limiting any damages they may attempt to claim. We've got to make them contract to *no whistle blowing to the government, no government remedies from any government agency, no punitive damages, no right to court or appeal so we can cut our losses,* while at the same time we must divert the clients' attention and seduce them into thinking their rights are preserved."

D.  And in addition thereto, just in case Defendants were caught in this fraudulent scheme, Defendants Zacks, and each of them, perpetrated fraud in the inducement of the Arbitration Clause: to have Plaintiffs lose their rights to redress not only the Standard of Conduct of the Investment Advisers Act of 1940, but from a civil damages point of view, to restrict and limit what Defendants Zacks knew to be recoverable damages, for very clear, intentional and tortious conduct by Defendants, and each of them.

215.  At all times complained of herein, Defendants, and each of them, are governed by, and are aware of, the very strict guidelines and mandates of the Investment Advisers Act of 1940. Defendants knew that any effort to limit their liability for intentional wrongdoing violates the spirit and the letter of the Investment Advisers Act of 1940. Notwithstanding, Defendants shirked their fiduciary duty, and did otherwise. Defendants did not tell, reveal, advise, counsel or admit in writing, or orally, what Defendants were doing but, instead, tried to defraud Plaintiffs, and each of them, by inducing them to sign a document that, in part, would take away all of the rights of Plaintiffs, and each of them.

Defendants' conduct is the very conduct that the courts have held is fraud in the inducement of an arbitration clause and, thus, is a matter to be heard by the court.

216.    At all times complained of herein, the courts will NOT allow fraud in the inducement of an arbitration agreement. This matter is to be heard by the court.

217.    Plaintiffs ask for a Declaration of rights and ruling by the court that:

> "Defendants, and each of them, in violation of substantive law, defrauded Plaintiffs Benezra by attempting to induce them into an invalid and illegal arbitration clause."

218.    In addition hereto, as patently described and explained herein above, in not one, but 3 different paragraphs, Zacks clearly led the Plaintiffs to believe that they had the right to proceed to court. This is shown in paragraphs 9, 10, and 21 of the IAA. Now, for Zacks to all of a sudden come to court, and complain that Plaintiffs have to arbitrate, is irritable proof of their intent to defraud, and attempt to induce, a fraudulent scheme in the arbitration. Why else would Defendants make it so very clear in the 3 paragraphs mentioned above, paragraphs 9, 10 and 21, all of which have a reasonable interpretation of the right to proceed to court for securities violations? There is no greater proof than the clear language of the Zacks Investment Advisory Agreement (IAA), and the conduct of Defendants, of Defendants' intent to engage in fraud to induce Plaintiffs to agree to the arbitration clause.

**D.    The purported Agreement, referred to as the IAA, was never signed and, per the document, is null and void. It must be signed. Plaintiff did NOT enter into any binding contract, without which, the issue of Arbitration never even arises.**

219.    There is no contract, as there is no signature, or mutual assent, by the Defendants, to the INVESTMENT ADVISORY AGREEMENT (IAA) on page 6 of the IAA.

220.    At all times complained of herein, the purported agreement has not been executed. Defendants, and each of them, state in paragraph 16, page 4, of the IAA in pertinent part:

> "This agreement shall <u>NOT</u> (EMPHASIS ADDED) become binding upon you (Zacks) unless accepted in writing (signed) by you (Zacks)."

221.    At all times complained of herein, Defendants, and each of them, DID NOT sign this document on behalf of Defendants Zacks.

222.    At all times complained of herein, it is fundamental law in North Carolina, in Illinois, in the Federal System, and everywhere else that, if a person drafts a document and says, in essence, that this agreement is not valid unless we sign it, then, if they don't sign it, there is no contract.

223.    At all times complained of herein, proof of this fact, said unsigned IAA document, is attached herein. Defendants, by attaching an unexecuted, unsigned,

unauthorized piece of paper, have given absolute proof to the court, that there is no contract. (Exhibit #1A)

224.    Plaintiffs herein seek a Declaration of this court as follows:

> "Defendants required, by the very words they authored, that the IAA
> document had to be signed by Defendants in order to be in force and
> effect. Defendants have admitted that they did not do this. Therefore, there
> is no contract. Thus, since there is no contract, there is NO Arbitration
> Clause. (*Reductio ad absurdum*)"

## 8th (Eighth) Cause of Action Against All Defendants

### (False Advertising)

225.    North Carolina General Statutes § 14-117 Fraudulent and Deceptive Advertising provides in pertinent part:

> "It shall be unlawful for any person, firm, corporation or association, with
> intent to sell or in anywise to dispose of merchandise, securities, service or
> any other thing offered by such person, firm, corporation or association,
> directly or indirectly, to the public for sale or distribution, or with intent to
> increase the consumption thereof, or to induce the public in any manner to
> enter into any obligation relating thereto, or to acquire title thereto, or an
> interest therein, to make public, disseminate, circulate or place before the
> public or cause directly or indirectly to be made, published, disseminated,
> circulated or placed before the public in this State, in a newspaper or other
> publication, or in the form of a book, notice, handbill, poster, bill, circular,
> pamphlet or letter, or in any other way, an advertisement of any sort
> regarding merchandise, securities, service or any other thing so offered to

44

the public, which advertisement contains any assertion, representation or statement of fact which is untrue, deceptive or misleading: Provided, that such advertising shall be done willfully and with intent to mislead. Any person who shall violate the provisions of this section shall be guilty of a Class 2 misdemeanor." (1915, c. 218; C.S., s. 4290; 1993, c. 539, s. 59; 1994, Ex. Sess., c. 24, s. 14(c).)

226.    Plaintiffs incorporate, by reference herein, the entire General Preamble Allegations, paragraphs 1 through 87, and the entire First Cause of Action for Fraud, paragraphs 88 through 139, as though fully set forth herein.

227.    Defendants, and each of them, sent out into the stream of commerce, websites, written materials, pamphlets, and other advertising materials with the intent of luring and defrauding the Plaintiffs, and each of them, and others similarly situated.

228.    At all times complained of herein, Defendants knew that the materials, writings, brochures and websites were false, untrue, deceptive and dishonest but, notwithstanding, continued to send such misrepresentations out to potential clients, specifically Plaintiffs and others, with the intent to use these avenues of false advertising to induce and lure Plaintiffs, and others similarly situated, to part with their money, and invest with Defendants, and each of them.

229.    As a proximate result of the violations of North Carolina General Statutes § 14-117, Fraudulent and Deceptive Advertising , a duty owed to the Plaintiffs, and each of them, Plaintiffs are entitled to actual damages, according to proof, within this court's jurisdiction.

230.    As a proximate result of the violations of the North Carolina General Statutes § 14-117, Fraudulent and Deceptive Advertising, and each of them, Plaintiffs are entitled to exemplary damages so as to set an example to the business world, so that other similarly situated individuals will not be harmed in a similar fashion.  Plaintiffs will obtain through

discovery, and prove at trial, a sum consistent with the guidelines as set forth by the U.S. Supreme Court and the Reviewing Courts of the State of North Carolina.

### Exhibits

231.     Plaintiffs incorporate, by reference, each and every Exhibit to the original filed complaint, Exhibits #1 through #21, as though fully set forth herein. Plaintiffs incorporate the unsigned, non-binding Investment Advisory Agreement (IAA), from Exhibit #1 of Defendant's Motion to Compel Arbitration, as the best evidence that the IAA Agreement was not signed by Defendants. Plaintiffs set forth a true and correct copy of the IAA document, attached by Defendants in said motion. (Exhibit #22)

///

///

///

///

///

**WHEREFORE**, Plaintiff prays for judgment against Defendants, and each of them, as follows:

### On all Causes of Action:

1.     For general damages according to proof, within jurisdiction of the court.

2.     For actual damages according to proof, within jurisdiction of the court.

3.     For exemplary damages, and/or treble damages, according to proof and within the constraints of case law, within the jurisdiction of the court.

4. For injunctive relief against Defendants, and each of them, to preclude similar conduct by Defendants from harming other similarly situated citizens, within the jurisdiction of the court.

5. For a declaration of rights by and between the parties, within the jurisdiction of the court, as set forth in all causes of action, especially the 7th Cause of Action

6. For such other relief that this court deems appropriate within the laws of North Carolina and The United States, within the jurisdiction of the court.

7. For attorney fees according to proof, within the jurisdiction of the court and permissible by law.

8. For costs of suit, within the jurisdiction of the court and permissible by law.

9. For prejudgment interest according to law, within the jurisdiction of the court and permissible by law.

10. For costs of suit and for such other and further relief as the Court deems just and proper, within the jurisdiction of the court and permissible by law.

///

///

///

///

DATED: 8/15/11

By: _____

Paul A. deMontesquiou
The Law Offices of Walsh & deMontesquiou
8012 Stonehaven Drive
Marvin, North Carolina, 28173